# Richmond.

E. H. CASHELL, ADMINISTRATOR OF JAMES LATANE
CASHELL v. SOUTHERN RAILWAY COMPANY.

March 21, 1929.

The opinion states the case.

*M. J. Fulton* and *Leake & Spicer*, for the plaintiff in error.

*Wirt P. Marks, Jr.,* for the defendant in error.

CAMPBELL, J., delivered the opinion of the court.

This action of trespass on the case was brought by E. H. Cashell, administrator, to recover damages for the death of James Latane Cashell, who was killed as a result of a collision between an automobile truck and a train of the Southern Railway Company. At the conclusion of the testimony, the defendant demurred to the evidence, the court sustained the demurrer and entered judgment in favor of the defendant company.

The accident occurred within the corporate limits of the city of Richmond, a short distance from the county line, at the point of intersection of the railway with Lewis street. The railway tracks at the point of collision run in an easterly and westerly direction. Lewis street runs in a northerly and southerly direction, so that the crossing of the railroad with the street is almost at right angles. The condition of Lewis street, instead of being that of an improved city street, was, at the time of the accident, that of an ordinary county road. The plant of the Lipscomb Lumber Company is situated northwest of the crossing.

The decedent was a hauling contractor, and had been engaged in hauling lumber over the Lewis street crossing to and from the Lipscomb plant, for a period of approximately two months prior to the accident. He was twenty-nine years of age and his sight and hearing were good.

The record shows the number of automobiles using the crossing to be from a minimum of five to a maximum of fifteen a day, and approximately an average of fifteen pedestrians passed daily over this crossing. There was a private dirt road running east and west on the north side of the crossing, parallel with the railroad,

with two forks going into the Lipscomb plant. This private road was on the up grade approaching Lewis street and the railroad crossing.

On the morning of the accident Cashell drove his truck from the lumber yard of the Lipscomb Company, along the west fork of the dirt road in a southerly direction, made the turn to the east and proceeded along the road parallel with the railroad and in an easterly direction, facing the direction from which the train approached until he reached Lewis street where he turned to the right to pass over the crossing. The truck driven by Cashell was a Day-Elder lumber truck twenty-one and one-half feet long; it had a hood over the driver's seat, but nothing such as side curtains or flaps to obstruct the view of Cashell.

The train which collided with the truck was the boat train which runs from West Point to Richmond, and it approached the crossing from the east; it was running at a rate of speed variously estimated at from forty to forty-eight miles per hour, and was one minute behind schedule time. While it is true there was no gate or automatic device to warn travelers of the approach of trains, it is conceded that there was no ordinance requiring such a device or the erection of gates.

It is clearly displayed by the record that when Cashell reached a point in Lewis street thirty feet from the main line, as he turned into the street, he had an unobstructed view of the track for a distance of 2,285 feet; that the distance from the north rail of the main track to the south rail of what is called the passing track was nine feet, and the distance between the rails of the respective tracks was 4.71 feet; that when the decedent reached a point approximately twelve or fourteen feet from the main track he brought his

truck almost to a stop; and that the truck was moving from three to five miles an hour and could have been stopped almost instantly.

There is no material conflict in the evidence. One witness for the plaintiff, in his examination in chief, stated that the view was obstructed by bushes, but upon cross-examination stated that from a point thirty feet from the main track the view was unobstructed. The testimony of the two eye-witnesses to the accident, introduced by the plaintiff, was in practical agreement. They stated that they were working on the roof of a house next to the railroad and saw Cashell drive out of the lumber yard into the road which runs parallel with the railroad track. The engineer had blown the whistle for the crossing, and as Cashell approached a point between thirty and forty yards from the building, Enroughty hallooed at him twice—he thought he heard him—and he (Enroughty) pointed down the railroad in the direction from which the train was coming. When Cashell came to the spur track, "he came almost to a dead stop," and "when he came almost to a dead stop the engineer blew the distress signal." When Cashell failed to stop, the distress whistle was again blown at a distance estimated to be from seventy-five to one hundred yards from the crossing. When Cashell "came almost to a dead stop," Pocklington testified: "I thought he was going to stop and let the train go by, but instead of that he immediately pulled off, and went on the track in front of the train."

Both of the witnesses testified that while they were unable to state positively that the speed of the train did not slacken between the time of the blowing of the distress signals and the impact, they did state that if

the speed of the train was decelerated it was not discernible to the eye.

There was a lack of agreement upon the part of plaintiff's witnesses and defendant's witnesses as to the distance the train ran after the collision, due, no doubt, to the stress of excitement after the accident, but there is not such a conflict of the evidence on this score as to warrant the conclusion that the speed of the train was not decreased. Especially is this true when we compare the negative testimony of the plaintiff with the positive testimony of the defendant.

Antone, the engineer in charge of the locomotive, stated positively that he blew the signal whistle for the crossing; that as he approached the crossing he saw Cashell approaching; that Cashell hesitated a moment when he came upon the side track; that this led him to think that Cashell was going to stop; that, when Cashell did not stop, he blew the distress whistle and applied the emergency brakes at a distance of two hundred and fifty feet from the crossing. He further testified that the whistle blew continuously for a distance of approximately 1,300 feet. He also stated that the train was running at a rate of speed of seventy feet a second, and that it generally takes about two and two-tenths seconds for the brakes to set in full in an emergency.

The principles of law applicable are well settled. In *Washington & O. D. Ry. Co.* v. *Zell*, 118 Va. 755, 88 S. E. 309, the duty of a driver of an automobile to "stop, look and listen," when approaching a railroad crossing is fully discussed by Judge Kelly. In the syllabus to that case, prepared by Judge Burks, we read:

"At a grade crossing of railroads the rights of a traveler on the highway and of the railroad company are 'mutual, reciprocal and co-extensive,' but generally a moving train is accorded the right of way. A

traveler approaching such crossing for the purpose of crossing must always exercise care proportioned to the known danger, and this care must be such as one who knows the danger and of prior right of passage would be expected to exercise. The duty of looking and listening for approaching trains must be discharged in such manner as will make the looking and listening effective. The greater the danger, the greater the measure of duty. The track itself is a proclamation of danger, and the traveler has no right to proceed across the track without such looking and listening for approaching trains, and if he does, and in consequence thereof is injured, there can be no recovery, although the railroad company may also be guilty of negligence proximately contributing to such injury.''

The contributory negligence of the decedent is manifest. Here we have a young man twenty-nine years of age, endowed with physical vigor and fully in the possession of the faculties of sight and hearing, driving (as expressed by the witness), in front of a fast moving train which could be seen at a distance of 2,-235 feet when he was within thirty feet of the track. The conclusion that by the exercise of ordinary care he could have avoided the accident is irresistible. It is apparent, therefore, that unless the doctrine of last clear chance can be invoked the case of the plaintiff must fall of its own weight.

In the brief of counsel for the plaintiff it is said: ''Consequently, if the speed of the train in the entire distance from the time Cashell's truck got in a position of danger (saying nothing as to what ought to have been done before), had been slackened one-fourth of a second, or possibly less, Cashell would have gotten out of danger and his life been saved. This fact clearly

makes the case one for the jury under the last clear chance doctrine.''

The answer to the contention that the right of recovery based on the doctrine of last clear chance should be measured by a fraction of a second is found in the language of Mr. Chief Justice Prentis, in *Washington, etc., Ry. Co.* v. *Thompson*, 136 Va. at page 603, 118 S. E. 78. There it is said:

■■ ''The rule has been repeated in *Hendry* v. *Virginia Ry. & P. Co.*, 130 Va. 283, 107 S. E. 716, thus: 'In order to apply that doctrine, the burden is upon the plaintiff, who is confessedly negligent, to prove by a preponderance of the testimony that after his peril became imminent there was a clear opportunity afforded the defendant to save him from the consequences of his own negligence, and this fact must be proved like any other fact upon which the plaintiff relies.' *Real Estate, etc., Co.* v. *Gwyn's Adm'x*, 113 Va. 337, 74 S. E. 208; *Norfolk-Southern Ry. Co.* v. *Smith*, 122 Va. 302, 94 S. E. 789; *Gunter* v. *Southern Ry. Co.*, 126 Va. 565, 101 S. E. 885; *Virginia Ry. & P. Co.* v. *Boltz*, 122 Va. 649, 95 S. E. 467; *Virginia Ry. & P. Co.* v. *Harris*, 122 Va. 657, 95 S. E. 403.

''It should and must be emphasized that a plaintiff is not entitled to recover under this doctrine upon a mere peradventure. He has no right to hold the defendant liable merely upon showing that perhaps, if the defendant's agents had responded properly, promptly, instantaneously, he might have been saved. The burden is upon him to show affirmatively by a preponderance of the evidence which convinces the average mind that by the use of ordinary care, after his peril was discovered, there was in fact a clear chance to save him. It is insufficient to show that there was a mere possibility of doing so.''

The contention of plaintiff in error that the doctrine of discovered peril applies to this case is untenable. While it is undisputed that the engineer saw Cashell, it is also true that Cashell could have and as a matter of law should have observed the approaching train. Even when within a few feet of the track, the deceased could have stopped the truck and avoided the accident. The uncontroverted evidence that Cashell did hesitate before driving upon the track justified the belief of the engineer that he would not disregard the primary law of self-preservation. When we view such unfortunate accidents in retrospect, it is easy to perceive how they might have been avoided. The test of legal liability is not applied retrospectively but is measured by the facts, the circumstances and the events as they appear prior to the injury, combined with the facts, the circumstances and the events which appear at the time of or immediately following the accident.

As we are of opinion that the negligence of Cashell was the proximate cause of the accident, which bars a recovery in any aspect of the case, it becomes unnecessary to discuss the assignment of error that the trial court erred in excluding from the consideration of the jury the ordinance of the city of Richmond offered in evidence by the plaintiff.

The judgment of the trial court must be affirmed.

*Affirmed.*